DUSTIN H. CARMACK, Individually and   )
as Administrator of the Estate of Kimberlee   )
Jo Carmack,   )
   )
               Plaintiff,   )      1:14-cv-01885-RLY-DML
   )
        vs.   )
   )
CITY OF INDIANAPOLIS, acting by and   )
through its Metropolitan Police   )
Department;   )
RICK HITE, Individually and in his   )
Official Capacity as Chief of Police,   )
SCOTT ROBINETTE,[1] Individually; and   )
BRIAN MAHONE, Individually,   )
   )
            Defendants.   )

## ENTRY ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This action arises out of a series of events that led to the tragic murder of

Indianapolis Metropolitan Police Officer Kimberlee Carmack and the suicide of her ex-

husband, IMPD Officer Ryan Anders, on April 17, 2014. Plaintiff, Dustin Carmack, is

Officer Carmack's son. He brings this action under 42 U.S.C. § 1983 on his own behalf[2]

---

[1] The correct spelling of Lt. Scott Robinett's last name is "Robinett," as reflected by the caption page of his deposition. (*See* Filing No. 88-9).

[2] Plaintiff purports to bring claims on his own behalf under Section 1983 and Indiana's Wrongful Death Act, but, as the City argued, he may not bring such claims because they lie only with the decedent's estate. *Thompson v. Dearborn Cty. Comm'rs*, No. 4:12-cv-55-SEB-WGH, 2013 WL 121256, at *5 (S.D. Ind. Jan. 8, 2013) (citing *Ray v. Maher*, 662 F.3d 770, 773 (7th Cir. 2011) and *General Motors Corp. v. Arnett*, 418 N.E.2d 546, 548 (Ind. Ct. App. 1981)). Therefore, to the extent he intended to bring such claims, the City's motion for summary judgment on Plaintiff's individual capacity claims is **GRANTED**.

and as Personal Representative of the Estate of Kimberlee Jo Carmack against the Defendants herein—the City of Indianapolis, acting by and through the Indianapolis Metropolitan Police Department ("IMPD"), Chief of Police Rick Hite, Deputy Chief of Police Brian Mahone ("Deputy Chief Mahone" or "Chief Mahone"), and Lieutenant Scott Robinett—alleging they violated Officer Carmack's Fourteenth Amendment due process rights and committed the state law torts of negligence and intentional infliction of emotional distress claims. On June 17, 2016, Lt. Robinett filed a motion for summary judgment on all claims asserted in the Second Amended Complaint. On June 24, 2016, the City, Chief Hite, and Chief Mahone filed a motion for summary judgment on those same claims. For the reasons explained below, both motions are **GRANTED**.

## I. Background

Carmack and Anders married on October 11, 2010, and the couple divorced three years later on October 23, 2013. (Filing No. 69, Second Amended Complaint ¶ 12). Anders did not handle the separation well. (Filing No. 88-1, Deposition of Dustin Carmack ("Carmack Dep.") at 62-64). He called Carmack "50 to 60 times a day," [s]how[ed] up on her police runs," and "was just being a nuisance trying to get her back." (*Id.* at 64).

### A. Criminal Investigation

On February 17, 2014, problems in their relationship escalated when Anders pursued Carmack in his marked police car. (Filing No. 97-3, Probable Cause Affidavit at 4). Carmack thought she had lost him, and stopped in a parking lot. (*Id.*). Anders then pulled up and screamed, "why didn't you fucking stop?" (*Id.*). As Carmack attempted to

back out, Anders stuck his foot under her tire, resulting in her driving over his foot. (*Id.*). The next day, IMPD Lt. Jim Tharp informed Chief Mahone that there were "domestic problems" between Carmack and Anders, and that Carmack "has possibly hit [Anders] with a car or ran over his foot." (Mahone Dep. at 12-13). Chief Mahone forwarded the information to IMPD's Special Investigations Unit ("SIU") to initiate a criminal investigation into the allegations. (*Id.* at 13). He then brought Carmack and Anders into his office separately, told them that IMPD was investigating a possible domestic situation, and informed them that they were to have no contact with each other during the investigation. (*Id.* at 13-14). At this point, the matter was in the hands of Commander David Robinson to determine how it would be investigated by SIU. (*Id.* at 17).

### B. SIU Investigation

SIU Sgt. John Green was initially assigned to investigate the domestic problems between Carmack and Anders. (Filing No. 88-4, Portions of Sgt. Green's Investigatory File, Bates Nos. 3844-47). He contacted Carmack multiple times for an interview on February 19, 20, and 21. (*Id.* at 3844-45). She refused to cooperate despite being assured that she was not the target of any potential criminal charges. (*Id.* at 3845). Carmack told Sgt. Green that she wished to avoid potential embarrassment from the investigation and "did not wish for Sgt. Ryan Anders to be criminally charged or disciplined." (*Id.* at 3847). Anders also refused to cooperate in the investigation. (*Id.* at 3845). Because Sgt. Green "did not have any witnesses available . . . that witnessed the incident or incidents that have occurred between Officer Anders and her ex-husband Sgt. Ryan Anders," SIU's criminal investigation was terminated. (*Id.* at 3847).

Commander Robinson transferred the investigation to Sgt. Judy Phillips with internal affairs "to investigate from the administrative end." (Filing No. 88-5, Deposition of David Robinson ("Robinson Dep."). The internal affairs unit "investigates allegations of administrative misconduct," which includes crimes committed by officers. (*Id.* at 14-15).

## C. Administrative Duty

Carmack continued to see Anders despite the no-contact order. (Filing No. 86-5, Deposition of Kimberley McGivern ("McGivern Dep.") at 20). When Chief Mahone learned of the continued contact between Carmack and Anders on March 12, 2014, he placed both of them on administrative leave. (Mahone Dep. at 23). In doing so, he suspended their police powers and temporarily removed their department-issued firearms, vehicles, identification, and badges. (*Id.* at 27-32, 59-60). The decision followed an internal determination that "there was something to" the domestic disturbance on February 17, 2014. (*Id.* at 26-27).

For her administrative assignment, Carmack was detailed to the Professional Development and Officer Wellness unit. (Robinson Dep. at 21). That unit assists officers "who are going through problems, [it] kind of point[s] them in the right direction, [and] give[s] them assistance." (*Id.*). During her assignment, Carmack worked closely with Officer Kimberley McGivern. (*Id.* at 21-22).

Carmack told Officer McGivern that she feared she would lose her job because she violated the no-contact order. (McGivern Dep. at 19). Carmack admitted she contacted Anders because "she had no choice . . . the day she stop[ped] seeing him, [] he

would kill her." (*Id.* at 20). She also disclosed that she continued to have sex with him because he threatened to post nude pictures of her to the entire IMPD and to expose her use of anxiety medication—a fact she had not disclosed to her medical liaison. (*Id.*).

### D. Domestic Violence Investigation

Shortly after Carmack's assignment to the Professional Development unit, Officer McGivern contacted domestic violence Det. Shani Anderson to see if she would speak with Carmack about the abuse. (Filing No. 88-3, Deposition of Shani Anderson ("Anderson Dep.") at 21). Det. Anderson interviewed Carmack and quickly initiated a criminal investigation into the alleged domestic violence. (Robinson Dep. at 24). Commander Robinson oversaw her investigation, providing Det. Anderson resources when they were available, but he did not "manag[e] the investigation[]." (*Id.* at 24-25). Det. Anderson's mission was to investigate the allegations against Anders with an open mind, and then determine whether there was "merit and probable cause for charges." (Anderson Dep. at 30).

On March 26, 2014, Det. Anderson began her investigation with a five-hour interview of Carmack. (*Id.* at 73; Filing No. 97-2, Timeline at Bates No. 4334). Within a week of beginning the investigation, Det. Anderson believed there was probable cause to support charges of stalking, rape, battery, and residential entry against Anders. (Anderson Dep. at 31). On March 28, she obtained a search warrant to place a GPS device on Anders' car as a means to track Anders' whereabouts and to provide a warning to Carmack if he "went within so many miles of her residence, the academy, downtown, those kinds of things." (*Id.*; Timeline at Bates No. 4335; Filing No. 88-7, Search Warrant

at Bates Nos. 1183-93). Between April 8 and 15, 2014, the Marion Superior Court issued several search warrants requested by Det. Anderson to search Anders' house, person, car, electronics, cellular telephone, and other property for evidence of stalking and intimidation. [3] (Filing No. 88-7, Search Warrants).

Despite Det. Anderson's efforts to keep the investigation quiet and confidential, Sgt. Green told Anders that Det. Anderson was investigating him. (Anderson Dep. at 65).

One of Det. Anderson's chief objectives was to keep Carmack safe from Anders. At Det. Anderson's suggestion, Carmack obtained a protective order with the assistance of attorneys from the Julian Center. (*Id.* at 29). Det. Anderson did not want Carmack to stay at her house during the investigation because Anders knew of its location. She therefore enlisted Carmack's friend, Terri Veach, "to take her from place to place," including hotels, making sure not to "keep her too long at one place." (*Id.* at 42). Det. Anderson was in contact with Carmack several times a day every day. (*Id.* at 44). Carmack cooperated with Det. Anderson's efforts to keep her safe, but when she returned to work after her temporary assignment to the Professional Development unit, she went

---

[3] Following frequent communication with the Marion County Prosecutor's Office, it declined to bring charges against Anders. (*Id.* at 32-33) (Q: "Did [the prosecutor] tell you that Kim Carmack was not a credible witness? Was that the issue?" A: "It wasn't like that. It was more of [] I need you to find more [evidence] because I think a jury would have a hard time trying to understand how a police officer could be a domestic violence victim.").

home alone "[t]oo many times" against her advice, including the day she was murdered. (*Id.* at 43-45).

### E. Discovery of the GPS Unit

Lt. Robinett knew Anders because he had worked with Anders' father, uncle, and aunt, all of whom were law enforcement employees with the Marion County Sheriff's Department. (Filing No. 86-1, Affidavit of Scott Robinett ("Robinett Aff.") ¶ 4). At no time did Lt. Robinett have supervisory responsibilities over Carmack or Anders. (*Id.* ¶ 5).

About nine months prior to the tragedy, Anders began to stop by Lt. Robinett's part-time job at the Olive Garden restaurant to talk. (Filing No. 88-9, Deposition of Scott Robinett ("Robinett Dep.") at 24-25). Anders' relationship with Carmack would come up in these private conversations, which resulted in Lt. Robinett telling Anders "hundreds of times" to leave her alone. (*Id.* at 34).

Approximately ten days before Carmack's murder, Lt. Robinett received a phone call at home and while off-duty from Anders asking to meet "at a church parking lot close to [Robinett's] house." (*Id.* at 50, 53; Timeline at Bates No. 4335). Lt. Robinett agreed. When he pulled into the parking lot, he discovered Anders "kind of kneeling down behind the trunk of the vehicle that he was driving." (Robinett Dep. at 50). Anders pointed to a device that was sitting on his bumper and asked Lt. Robinett if it was a GPS unit. (*Id.* at 51). He replied that it looked like a GPS unit. (*Id.*). Lt. Robinett "didn't really give [the matter] much thought because [he] wasn't sure who put [the GPS] on [Anders' car], when it had been placed on there and why it was placed on there and for

what purpose." (*Id.* at 55). He then told Anders to "leave her . . . alone and leave it alone and to contact his attorney." (*Id*. at 52). Anders took two pictures of the GPS unit and placed it back on the bumper of the car. (*Id*.). At that point, Lt. Robinett drove back home. (*Id.* at 53).

Lt. Robinett did not report to anyone at IMPD about Anders' discovery of the GPS device on his vehicle because he "had no idea that [Anders] was a subject of a criminal investigation." (*Id.* at 56-57). Det. Anderson interviewed Lt. Robinett on April 16, 2014, the night before Carmack's murder, due to the number of phone calls she discovered between him and Anders. (Anderson Dep. at 54). She testified that Lt. Robinett understood that Anders was the target of the investigation. (*Id.* at 55). Nevertheless, Lt. Robinett did not tell Det. Anderson or anyone else that Anders had discovered the GPS device. (*Id*. at 56).

### F.     The Murder-Suicide

On April 17, 2014, Carmack went home to pick up clothes. (*Id.* at 57). Video surveillance footage from a neighbor's house showed that Anders had been waiting a few houses down from Carmack's in his grandmother's vehicle. (Filing No. 88-10, Deposition of Leslie Vanbuskirk ("Vanbuskirk Dep.") at 19-20). He arrived undetected because that car did not have a GPS device on it. (*Id.* at 26). He fired one shot through the back sliding glass door, saw Carmack near the back door, and pursued her through the kitchen. (Filing No. 98-3, Inter-Department Communication from Det. VanBuskirk). Anders shot Carmack several times and then inserted the pistol into his mouth and pulled the trigger. (*Id.*). It was later discovered that Carmack brought her personal firearm with

her to the house, but she left the weapon in her car when she entered the house. (Carmack Dep. at 17-18).

No one knows whether Anders knew Carmack would be at the house that morning. (Anderson Dep. at 58; Vanbuskirk Dep. at 19, 21). Moreover, Det. Leslie Vanbuskirk uncovered no evidence in the subsequent homicide investigation that someone inside IMPD tipped off Anders that Carmack would be at the house on April 17, 2014. (Vanbuskirk Dep. at 30).

## II. Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of designated evidence which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving it might change the outcome of the case under the governing law. *Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir. 1992). A

factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *Anderson,* 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of that party. *Anderson,* 477 U.S. at 255.

## III. Discussion

### A. Federal Due Process Claims

In his Second Amended Complaint, Plaintiff alleges Chief Hite, Chief Mahone, and Lt. Robinett violated Officer Carmack's substantive due process right to bodily integrity by failing to protect her from Anders. His claim is brought pursuant to Section 1983. To state a claim for relief under Section 1983, a plaintiff must allege (1) the deprivation of a right secured by the Constitution or the laws of the United States which (2) was caused by a person acting under color of state law. *D.S. v. East Porter Cty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015).

The Due Process Clause of the Fourteenth Amendment prohibits the state from depriving a "person of life, liberty, or property." U.S. Const. amend. XIV. The Clause places a limitation on the state's power to act; however, it does not act "as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cty. Dep't of*

*Soc. Servs.*, 489 U.S. 189, 195 (1989).   In other words, its purpose is "to protect people from the State, not to ensure that the State protect[s] them from each other."  *Id.* at 196. Thus, in *DeShaney*, the Supreme Court concluded that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  *Id.* at 197.

Two exceptions have arisen out of this principle.  First, the state is duty-bound to protect individuals with whom it has a "special relationship,"[4] such as a custodial relationship that cuts off alternative avenues of aid.  *D.S.*, 799 F.3d at 798 (citing *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998)).  Second, the "state created danger" exception applies when "a state actor's conduct 'creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger than they otherwise would have been.'"  *Id.* (quoting *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993)).  This exception consists of three elements: (1) the state, by its affirmative acts, created or increased a danger faced by an individual; (2) the state's failure to protect

---

[4] It is not clear where the Seventh Circuit stands on the "special relationship" exception.  For example, in *Paine v. Casos*, 678 F.3d 500 (7th Cir. 2012), the court stated that the "special relationship" exception is unnecessary, as the relevant inquiry is whether state actors needlessly created a risk of harm.  *Id.* at 510 ("Some decisions call this a special-relationship exception, but we prefer to avoid the jargon.  There's no need to hunt for 'special relationships' (what makes one 'special,' anyway?), and it is misleading to treat augmented risk as an 'exception' to *DeShaney*."); *see also Sandage v. Bd. of Commr's of Vanderburgh Cty.*, 548 F.3d 595, 598 (7th Cir. 2008) (noting that the "special relationship" and "state-created danger" exceptions are functionally the same); *Archie v. City of Racine*, 847 F.2d 1211, 1223 (7th Cir. 1988) (en banc) (noting the "special relationship" exception "has become a magic phrase, a category in which to dump cases when a court would like to afford relief," and that "it is better to jettison the language").  Yet in *D.S.*, *supra,* decided in August 2015, the court includes the "special relationship" exception as one of the two recognized exceptions to *DeShaney*.  799 F.3d at 798. Because *D.S.* is the most recent decision from the Seventh Circuit addressing this issue, the court is compelled to address both exceptions.

that individual from danger was the proximate cause of her injury; and (3) the state's failure to protect shocks the conscience. *Id.*

As a final note, all three officers invoke the defense of qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Humphries v. Milwaukee Cty.,* 702 F.3d 1003, 1006 (7th Cir. 2012) (citations and quotation marks omitted). To defeat the defense, a plaintiff must establish two elements: (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The court has discretion to determine in which order the questions should be answered; "a negative answer to either one is enough to establish the defense of qualified immunity." *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009) (citing *Pearson*, 555 U.S. at 242).

### 1.    Lt. Robinett

Plaintiff brings a claim against Lt. Robinett because he "failed to intervene" and prevent the murder of Carmack by Anders. Plaintiff clarifies that his claim is not a typical "failure to intervene" claim because Anders' murder was not a police action. Instead, his claim is based upon the fact that Lt. Robinett knew that Anders discovered the GPS device on his car and did not inform Det. Anderson, or anyone at IMPD, of that fact. Lt. Robinett's failure to protect Carmack, Plaintiff argues, violated Carmack's substantive due process right to bodily integrity.   Lt. Robinett argues summary judgment

is required because: (1) he did not act under color of law; (2) he did not violate Carmack's constitutional right to bodily integrity; and (3) he is entitled to qualified immunity.

### a.    Color of Law

The first issue is whether Plaintiff has alleged facts sufficient to establish that Lt. Robinett was acting under color of state law during his discussions with Anders. As a general rule, "a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988). Merely because a police officer is a defendant in a Section 1983 action does not mean he acted under color of state law. *Coles v. City of Chi.*, 361 F.Supp.2d 740, 748 (N.D. Ill. 2005) (citing *Gibson*, 910 F.2d at 1516). As the Supreme Court observed, the "acts of officers in the ambit of their personal pursuits are plainly excluded." *Screws v. United States*, 325 U.S. 91, 111 (1945).

No bright line distinguishes a police officer's personal pursuits from actions taken under color of state law. *Coles*, 361 F.Supp.2d at 748. Thus, a police officer may be acting under color of state law even though he is off-duty at the time of the alleged deprivation of rights. *United States v. Christian*, 342 F.3d 744, 751 (7th Cir. 2003). "[T]he essential inquiry is whether the police officer's actions related in some way to the performance of official duty." *Coles*, 361 F.Supp.2d at 748 (citing *Gibson*, 910 F.2d at 1517); *see also Christian*, 342 F.3d at 751 ("Deciding whether a police officer acted under color of state law should turn largely on the nature of the specific acts the police

officer performed, rather than on merely whether he was actively assigned at the moment to the performance of police duties.").

Plaintiff argues that Lt. Robinett was acting under color of law when he confirmed Anders' suspicion that the device on Anders' department-issued vehicle looked like a GPS device. At that time, Lt. Robinett was off-duty, and agreed to meet Anders at a church parking lot near his home. Lt. Robinett had nothing to do with the SIU investigation, did not supervise Carmack or Anders, and was unaware of who and for what purpose the GPS device was placed on Anders' vehicle. Given the undisputed material facts in the record, the court finds Lt. Robinett's confirmation of the GPS device on Anders' vehicle was not related to his official duty as an IMPD lieutenant. Rather, the facts reflect that he agreed to meet with Anders and answered his question regarding the device in his role as an acquaintance or friend. Therefore, the court must find, as a matter of law, that Lt. Robinett was not acting under color of law.

Assuming Lt. Robinett was acting under color of state law, and for the sake of completeness, the court will next address whether he deprived Officer Carmack of her substantive due process right to bodily integrity.

**b.      Deprivation of Plaintiff's Due Process Right**

Plaintiff argues the IMPD established a special relationship with Carmack that discouraged her from pursuing other avenues of protection from Anders. For example, Plaintiff claims the IMPD's efforts to protect Carmack went far beyond what it would normally do to protect an ordinary citizen. Due to these efforts, Plaintiff continues, Carmack did not leave town because "she believed that IMPD officers were monitoring

Anders and would warn her if he got close to her." (Filing No. 96, Plaintiff's Response in Opposition at 9). Plaintiff's claim, however, is one against Lt. Robinett, not the City. It is undisputed that Lt. Robinett did not have a special relationship—indeed, any relationship—with Carmack. Furthermore, this exception typically applies to instances "[w]hen the state takes a person into custody and holds him there against his will." *DeShaney*, 489 U.S. at 199-200; *see also Losinski v. Cty. Of Trempealeau*, 946 F.2d 544, 550 (7th Cir. 1991) (noting that custody, within the special relationship exception, "implies restraint"). That did not occur here. Accordingly, this exception does not apply.

Plaintiff also invokes the "state-created danger" exception. He argues that Lt. Robinett rendered Carmack more vulnerable to Anders' attack than she otherwise would have been by confirming to Anders that the device on his car was likely a GPS. According to Plaintiff: (1) had Det. Anderson known that Anders discovered the device, "she would probably have put Carmack up in her own house" (Plaintiff's Response in Opposition at 10, citing Anderson Dep. at 56); and (2) had Lt. Robinett not confirmed Anders' suspicions about the device, Anders may have used his vehicle on the day of the murder, and not his grandmother's, and his presence in her neighborhood may have been detected in time to save her life (*id*. at 10-11).

In support of his claim, Plaintiff relies on *Reed v. Gardner*, *supra*. There, law enforcement officers pulled Cathy Irby over and arrested her, leaving her intoxicated passenger, Larry Rice, inside the vehicle with Irby's keys. 986 F.2d at 1124. Rice proceeded to drive the vehicle and, during his attempt to allude law enforcement, crossed the center line and collided head on with the Reed family vehicle. *Id.* at 1123. The

15

accident resulted in the death of Mrs. Reed and her eight-month-old fetus, traumatic brain injury to one of the Reed children, and severe emotional trauma to the Reed family. *Id*. at 1123-24. The Reeds brought suit against the law enforcement officers who arrested Irby, alleging the officers violated their constitutional rights by leaving an intoxicated driver at the wheel of Irby's car.

The district court dismissed the claim pursuant to *DeShaney*, holding the officers did not create the dangerous situation which resulted in the tragic accident because the driver was also intoxicated. *Id.* at 1124. The Seventh Circuit reversed, holding the district court went outside the pleadings to find Irby was arrested for driving while intoxicated. *Id.* at 1126. If the pleadings had so alleged, however, the district court would have been affirmed. The Seventh Circuit explained: "The reason is simple: without state intervention, the same danger would exist. The state action did not place individuals in a position of danger that otherwise they would not have faced." *Id.* at 1125. Because the pleadings did not include that allegation, the Reeds' stated a claim upon which relief could be granted. "It is the special circumstance plead in this case, that the defendants removed a driver, who it must be inferred was sober, and left behind a passenger, whom they knew to be drunk, with the car keys, that states a claim for deprivation of constitutional rights under 42 U.S.C. § 1983." *Id.* at 1127.

Another case worthy of note is *Losinski v. Cty. of Trempealeau*, *supra*. There, the victim of domestic violence, Julie Losinski, was in the midst of a divorce from her estranged husband, Donald. 946 F.2d at 547. She was fearful of Donald because of his violent tendencies and the presence of loaded guns inside the house. *Id.* She therefore

asked a law enforcement officer to accompany her to the trailer she formerly shared with him to retrieve her belongings.  *Id.*  When she arrived with the officer, Donald asked to speak to her alone.  *Id.*  The two entered a bedroom while the officer remained in the hallway.  *Id.*  Despite the ensuing argument between the two, the officer did not try to interrupt or otherwise separate the two.  *Id.* at 548.  Not long thereafter, Julie's husband grabbed a loaded gun, shot, and killed her.  *Id.*

The district court dismissed the constitutional claim brought by Julie's children and her estate, and the Seventh Circuit affirmed, finding "no evidence that the state acted to create the danger."  *Id.* at 550.  The court reasoned that "the state did not subject Julie involuntarily to an existing danger . . . , it did not force her to proceed[,] [and] it did not require her to stay."  *Id.*  Moreover, even if the officer "knew of Donald's violent tendencies prior to going to the trailer," the outcome would be the same.  *Id.* at 551.  This is because, the court explained, "[t]he essence of the Court's exception in *DeShaney* is state creation of dangers faced or involuntary subjection to known risks.  Neither element is evident here."  *Id.*

In the present case, Lt. Robinett's agreement with Anders that the device on his vehicle was likely a GPS "did not place [Carmack] in a position of danger that [she] otherwise would not have faced."  *Reed*, 986 F.2d at 1125.  Lt. Robinett did not coerce Carmack to return to her home on April 17; she went of her own accord and against the orders of Det. Anderson.  Furthermore, despite Plaintiff's speculative arguments as to what might of have occurred had Lt. Robinett denied Anders' suspicion, there is no evidence that Lt. Robinett's confirmation of the device was the proximate cause of

Carmack's demise.  Finally, Lt. Robinett's failure to notify anyone in IMPD that the

investigation of Anders had been compromised does not reach the conscious-shocking

level.  As the Supreme Court explained,

> [T]he Constitution does not guarantee due care on the part of state officials;
> liability for negligently inflicted harm is categorically beneath the threshold
> of constitutional due process.  It is, on the contrary, behavior at the other end
> of the culpability spectrum that would most probably support a substantial
> due process claim; conduct intended to injure in some way unjustifiable by
> any government interest is the sort of official action most likely to rise to the
> conscience-shocking level.

*Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998) (internal citations omitted)

(citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("Historically, this guarantee of

due process has been applied to *deliberate* decisions of government officials to deprive a

person of life, liberty or property." (emphasis in original)).  Although Lt. Robinett should

have informed Det. Anderson of Anders' discovery of the GPS, his conduct, as a matter

of law, cannot be said to constitute a deliberate attempt to deprive Carmack of her liberty

interest.  Lt. Robinett's motion for summary judgment on Plaintiff's substantive due

process claim is therefore **GRANTED**.  Having so found, the court need not address his

defense of qualified immunity.

### 2.    Deputy Chief Mahone

Plaintiff claims that Chief Mahone violated Carmack's right to bodily integrity by

depriving her of her department-issued firearm, leaving her defenseless against Anders.

Chief Mahone argues that summary judgment is warranted because: (1) he did not violate

Carmack's due process liberty interest in bodily integrity and, alternatively, (2) he is

entitled to qualified immunity.

### a.     Deprivation of Carmack's Due Process Right

As noted in the Background Section, Chief Mahone took her weapon—and Anders' weapon—when they were placed on administrative leave for violating his no-contact order following the February 17 incident in which Carmack allegedly ran over Anders' foot.  Plaintiff argues that treating Carmack and Anders as equally at fault for the February 17 incident was unreasonable because "[n]othing suggests that Carmack was at fault in [the February 17 incident] [and] [n]othing suggests that Carmack ever posed a danger to Anders at any time in their relationship."  (Plaintiff's Response in Opposition at 14).

Plaintiff's argument misses the mark.  At the time Chief Mahone placed Carmack and Anders on administrative leave, there was no evidence of who was at fault.  He knew that Carmack and Anders were having domestic problems, but he did not know the extent of those problems or the circumstances surrounding the February 17 incident.  (Mahone Dep. at 26).  He testified:

> There was a – an understanding that something might have happened in the parking lot at roll call and that they could have been arguing back and forth and that maybe he was intentionally struck or it was accidental.  But as I understand that there was something that led up to that, to her having to leave or wanting to leave or get away from him or to hit him.  Again, it was the front end of the investigation; and without any certainty of what was happening, we were just trying to sort through things.

(*Id.* at 30).  He also testified that he placed them on administrative leave and stripped them of their weapons, among other things, to reduce the risk of a similar "workplace situation" between Carmack and Anders while the administrative investigation of the February 17 incident was ongoing.  (*Id.* at 26).

The designated evidence does not support the inference that Chief Mahone's decision to take Carmack's weapon created or increased a danger to her. Carmack was aware of the danger Anders posed; nevertheless, on the day of her murder, she was home alone, against the advice of Det. Anderson. Nor does the evidence support an inference that Deputy Chief Mahone's decision proximately caused Carmack's death. Carmack carried a personal firearm with her to the house on the day she was murdered, but she left it in her car. Furthermore, Anders killed Carmack in a spontaneous attack. There is no evidence to suggest that even if she had her department-issued firearm on her person, she would be alive today. And lastly, Deputy Chief Mahone's decision, given the uncertainty over whether Carmack intentionally or accidentally ran over Anders' foot, was justified, and certainly does not shock the conscience. *Lewis*, 523 U.S. at 849. Accordingly, Chief Mahone did not violate Carmack's right to bodily integrity as a matter of law.

### b. Qualified Immunity

Although the court need not address the merits of Deputy Chief Mahone's defense of qualified immunity, the court will briefly address it for the sake of completeness.

In his Response in Opposition, Plaintiff does not challenge the merits of Chief Mahone's argument that the qualified immunity defense bars the federal claims against him. Plaintiff, however, bears the burden of defeating Chief Mahone's defense. *Humphries*, 702 F.3d at 1006. Plaintiff's failure to address the merits of the individual capacity claim against the Chief results in waiver. *See Palmer v. Marion Cty.*, 327 F.3d 588, 598-99 (7th Cir. 2003) ("[B]ecause [plaintiff] failed to delineate his negligence claim in his district court brief in opposition to summary judgment or in his brief to this

Court, his negligence claim is deemed abandoned."); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir.1999) (stating that arguments not presented to the district court in response to summary judgment motions are deemed waived). Thus, even if the court were to find an issue of fact on the constitutional question, the court would still find in favor of Deputy Chief Mahone as he is entitled, as a matter of law, to the defense of qualified immunity. Defendants' motion for summary judgment on Plaintiff's individual capacity claim against Chief Mahone is therefore **GRANTED**.

### 3. Chief Hite

In his Second Amended Complaint, Plaintiff alleges that Chief Hite is sued in both his individual and official capacities. (Second Amended Complaint ¶ 11). In his Response in Opposition, Plaintiff argues that Chief Hite, as the final policy-making official for the police department, delegated the final policy-making authority to take away Carmack's weapon to Deputy Chief Mahone or, at the very least, ratified it. Such claims seek to subject the municipality, not Chief Hite individually, to Section 1983 liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). Because Plaintiff has not advanced any argument in support of an individual capacity claim against Chief Hite, the claim is deemed waived. *Caruso*, 197 F.3d at 1197.

The court now turns to the merits of Plaintiff's official capacity claims. As noted above, Plaintiff argues that Chief Hite delegated the authority to place officers on administrative leave to Deputy Chief Mahone. *See Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 674-75 (7th Cir. 2009) (stating that a municipality may be liable for a

section 1983 violation if "an individual with final policy-making authority for the municipality (on the subject in question) caused the constitutional deprivation"). Therefore, Plaintiff continues, "[he] is a policy-making official with regard to placing Carmack on administrative leave and requiring her to surrender her [d]epartmental firearm." (Plaintiff's Response in Opposition at 16).

"Under the delegation theory, the person or entity with final policymaking authority must delegate the power to make policy, not simply the power to make decisions." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009). Final policymaker status is "a question of state or local law," and "often turns on whether his decisions are subject to review by a higher official or other authority." *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780-81 (7th Cir. 2011).

In his deposition, Chief Hite was asked whether he approved Deputy Chief Mahone's decision to place Carmack and Anders on administrative leave pending the outcome of the investigation. (Filing No. 88-6, Deposition of Rick Hite ("Hite Dep.") at 24). He responded that it was not a decision that called for his approval "at that point" because no one had challenged—i.e., appealed—the decision. (*Id.*; *see also* Filing No. 103-1, Declaration of Brian Mahone ("Mahone Dec.") ¶¶ 5-8 (stating that Carmack "had the opportunity to have former Chief of Police Rick Hite review my order and issue a final decision," but she did not do so)). In other words, while Chief Hite gave Chief Mahone the authority to place Carmack and Anders on administrative leave, Chief Mahone's decision was ultimately "subject to review by a higher official." Therefore, as a matter of law, Chief Mahone was not a final policymaker.

Plaintiff also argues that Chief Hite ratified Deputy Chief Mahone's decision. Under this theory, Plaintiff "must allege that a municipal official with final policymaking authority approved the subordinate's decision and the basis for it." *Darchak*, 580 F.3d at 630 (7th Cir. 2009) (internal quotation marks and citation omitted). As noted above, Chief Hite did not approve Chief Mahone's decision nor approve the basis for it. (Hite Dep. at 24, 83; Mahone Dec. ¶¶ 5-8). Furthermore, Carmack did not bring a challenge to Chief Mahone's decision. (Hite Dep. at 24-25). Therefore, as a matter of law, Chief Hite did not ratify Chief Mahone's decision. Defendants' motion for summary judgment on the individual and official capacity substantive due process claims against Chief Hite must be **GRANTED**.

## B.    State Law Claims

Plaintiff brings state law negligence and intentional infliction of emotional distress claims against the City, Chief Hite, Deputy Chief Mahone, and Lt. Robinett. Although there is no federal claim left upon which the court may assert original jurisdiction over Plaintiff's claims, the court elects to take supplemental jurisdiction over his state law claims, as they "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Moreover, the resolution of the state law claims "can be decided in only one way"—i.e., they must be dismissed. *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1252 (7th Cir. 1994). The court begins its discussion with Plaintiff's individual capacity tort claims.

### 1. Individual Capacity Claims

Defendants argue they are entitled to immunity under the Indiana Tort Claims Act ("ITCA") pursuant to the "law enforcement immunity" provision. It provides:

> A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from the following: ... [t]he adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment.

Ind. Code § 34-13-3-3(8). Whether a governmental entity is immune from liability under the ITCA is a question of law for the court, and the party seeking immunity bears the burden of demonstrating that its conduct comes within the Act. *F.D. v. Ind. Dep't of Child Servs.*, 1 N.E.3d 131, 136 (Ind. 2013) (citing *Mangold ex rel. Mangold*, 756 N.E.2d 970, 975 (Ind. 2001)).

In determining whether the immunity provision applies, the court must "first determine whether the officer was acting within the scope of his or her employment when the injury to the plaintiff occurred." *Harness v. Schmitt*, 924 N.E.2d 162, 165 (Ind. Ct. App. 2010). If the officer was, the action is barred. Ind. Code § 34-13-3-5(c) ("A lawsuit filed against an employee personally must allege that an act or omission of the employee that causes a loss is . . . clearly outside the scope of the employee's employment."). Second, the court must determine "whether the officer was engaged in the enforcement of law at that time." *Id.*

#### a. Lt. Robinett

##### i. Immunity

Lt. Robinett cannot claim immunity under the ITCA, Plaintiff argues, because he acted outside the scope of his employment. But his Second Amended Complaint alleges that Lt. Robinett is sued in his individual capacity and acted in the course of his employment by the City. (Second Amended Complaint ¶¶ 11, 33). Plaintiff's allegations are judicial admissions of fact; therefore, Plaintiff is bound by them. *Help At Home, Inc. v. Medical Capital, L.L.C.*, 260 F.3d 748, 753 (7th Cir. 2001) ("Judicial admissions are formal concessions in the pleadings, or stipulations by the party of its counsel, that are binding upon the party making them."). Accordingly, Lt. Robinett's motion for summary judgment on Plaintiff's state law claims for negligence and intentional infliction of emotional distress is **GRANTED**.

### ii. Merits of Plaintiff's State Law Claims

For the sake of completeness, the court will address the merits of the state law claims asserted against Lt. Robinett. To prevail on a claim for intentional infliction of emotional distress, the plaintiff must show that the defendant's conduct: (1) was extreme and outrageous; and (2) intentionally or recklessly caused the plaintiff's severe emotional distress. *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991) (quoting RESTATEMENT (SECOND) OF TORTS § 46 (1965)). Lt. Robinett contends that Plaintiff's claim for intentional infliction of emotional distress fails as a matter of law because there are no facts from which a reasonable juror could conclude that he intended the death of Carmack. Plaintiff did not respond to this argument and thus, his claim is deemed waived. *Caruso*, 197 F.3d at 1197.

To prevail on a claim for negligence, Indiana law requires the plaintiff to establish the following three elements: (1) a duty owed to the plaintiff by the defendant, (2) a breach of the duty, and (3) an injury proximately caused by the breach of duty. *Yost v. Wabash College*, 3 N.E.3d 509, 515 (2014) (citing *Phenning v. Lineman*, 947 N.E.2d 392, 398 (Ind. 2011)). Whether a duty exists is a question of law. *Id.*

Lt. Robinett argues Plaintiff's negligence claim fails as a matter of law because (1) he did not owe a duty to Carmack to prevent her death, and (2) his failure to disclose Anders' discovery of the GPS on his car was not the proximate cause of her death.

Plaintiff relies on Chief Hite's testimony to establish the first two elements of his negligence claim, which states, in pertinent part:

> We have a fiduciary duty not to hinder an investigation in any way. [Lt.] Robinett is a former Chief in this department . . . and he held a command position in investigations. He did covert-type investigations as well. Not only that, if he were a rookie officer first day in, he would have a fiduciary responsibility to tell someone of the information he received from Mr. Anders.

(Hite Dep. at 52-53). By this testimony, Plaintiff establishes that Lt. Robinett had a duty not to compromise the investigation and to inform someone at the IMPD of Anders' discovery. But that is not the issue. The issue is whether Lt. Robinett owed a duty to Carmack arising from his relationship with her. *See Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991) (holding a plaintiff must establish "a duty on the part of the defendant to conform h[is] conduct to a standard of care arising from h[is] relationship with the plaintiff"); *Neal v. Homebuilder's, Inc.*, 111 N.E.2d 280, 285 (Ind. 1952) ("The duty to exercise care for the safety of another arises as a matter of law out of some relation

existing between the parties."). In addition, Plaintiff fails to establish that Lt. Robinett's failure to inform was the proximate cause of Carmack's death. "A willful, malicious criminal act of a third party is an intervening act that breaks the causal chain between the alleged negligence and the resulting harm." *Merchants Nat'l Bank v. Simrell's Sports Bar & Grill, Inc.*, 741 N.E.2d 383, 389 (Ind. Ct. App. 2000). Here, Anders' surprise ambush, which resulted in Carmack's untimely death, broke the chain of causation. Accordingly, even if Lt. Robinett were not entitled to law enforcement immunity, the court would still grant summary judgment in his favor on Plaintiff's state law claims.

### b.    The Chiefs

Chief Hite and Chief Mahone are also sued in their individual capacities and are alleged to have acted within the course and scope of their employment. (Second Amended Complaint ¶¶ 8, 11, 33). Like the individual capacity claim against Lt. Robinett, Plaintiff is bound by these allegations. *Help At Home*, 260 F.3d at 753. Accordingly, the Chiefs' motion for summary judgment on Plaintiff's state law claims for negligence and intentional infliction of emotional distress must be **GRANTED**.

### 2.    Official Capacity Claims

Plaintiff also argues the City is liable for the acts of Chief Mahone and Lt. Robinett under the doctrine of *respondeat superior*. Under that doctrine, an employer is liable for the injurious acts of its employees which were committed within the course and scope of their employment. *Walgreen Co. v. Hinchy*, 21 N.E.3d 99, 106-07 (Ind. Ct. App. 2014), *trans. denied*, 29 N.E.3d 1274 (Ind. 2015).

### a.    Chief Mahone

Plaintiff's claim against Chief Mahone mirrors his claim under Section 1983; by placing Carmack on administrative leave and taking her department-issued firearm, he rendered her more vulnerable to Anders' attack.

Under the law enforcement immunity provision, "enforcement" includes "compelling or attempting to compel the obedience of another to laws, rules, or regulations, and the sanctioning or attempt to sanction a violation thereof." *Johnson ex rel. Indiana Dep't of Child Servs. v. Marion Cty. Coroner's Office*, 971 N.E.2d 151, 158 (Ind. Ct. App. 2012) (internal quotation marks and citation omitted). "The investigation of crimes is a preliminary step in the 'sanctioning' of their violation, . . . [and] constitutes a law enforcement activity." *Snyder v. Smith*, 7 F.Supp.3d 842, 875 (S.D. Ind. 2014). The City maintains that Chief Deputy Mahone's order falls within the ITCA's law enforcement immunity provision because it was issued in an attempt to compel obedience to IMPD's internal policies and procedures. Plaintiff counters that the order was merely a personnel decision outside the scope of the immunity provision.

The City's involvement with the domestic problems between Carmack and Anders began with a criminal investigation. Because neither party would cooperate, the matter was turned over to internal affairs to determine whether administrative rules had been violated. At that point, Chief Mahone issued his administrative order. Soon thereafter, the matter was turned into a criminal investigation after Carmack confided in Officer McGivern regarding Anders' abuse. Placing both officers on administrative leave and requiring them to temporarily surrender their service weapons was a preliminary step in

the City's investigation of potential criminal activity. At the very least, Chief Mahone's order was in furtherance of IMPD's internal affairs investigation. Therefore, the City is not liable for the acts of Chief Mahone.

### b. Lt. Robinett

Next, Plaintiff alleges the City is liable for Lt. Robinett's response to Anders' inquiry regarding the GPS on his car. The issue raised is whether his conduct was within the course and scope of his employment as a lieutenant of the IMPD. To fall within the scope of employment, the conduct must be "'of the same general nature as that authorized, or incidental to the conduct authorized.'" *Bushong v. Williamson*, 790 N.E.2d 467, 473 (Ind. 2003) (quoting *Celebration Fireworks, Inc. v. Smith*, 727 N.E.2d 450, 453 (Ind. 2000)). "An act is incidental to authorized conduct when it is subordinate to or pertinent to an act which the servant is employed to perform, or when it is done to an appreciable extent, to further his employer's business." *Id.* (internal quotation marks and citations omitted). An employer is not responsible, however, for actions taken "on the employee's own initiative, [] with no intention to perform it as part of or incident to the service for which he is employed." *Robbins v. Trustees of Indiana Univ.*, 45 N.E.3d 1, 8 (Ind. Ct. App. 2015) (internal citations and quotations omitted). Whether the tortious act of an employee is within the scope of employment is generally a question of fact, but where "*none* of the employee's acts were authorized," the question is one of law. *Walgreen v. Hinchy*, 21 N.E.3d 99, 107 (Ind. Ct. App. 2014).

Lt. Robinett did not converse with Anders in the church parking lot of his own volition, Plaintiff argues, because he responded to a request for help from an officer he

29

knew to be troubled. In addition, he argues, the information Lt. Robinett gleaned from the conversation—the likely presence of a GPS on Anders' vehicle—benefited the City because it would certainly want to know if the IMPD's investigation of Anders had been compromised. "Obviously," Plaintiff concedes, "Robinette's failure to pass that information up the chain of command was not authorized. But his initial acquisition of the information appreciably furthered his employer's interests." (Plaintiff's Response in Opposition at 26).

Given the undisputed evidence, no reasonable jury could find the short conversation between Lt. Robinett and Anders was within the scope of his employment. When Anders called Lt. Robinett, he was off-duty and at home. The conversation between the two consisted of Lt. Robinett confirming "yes, it appeared to be [a] GPS to me," and advising Anders "to put it back, leave her the fuck alone and leave it alone and to contact his attorney." (Robinett Dep. at 51-52). Although Lt. Robinett had an opportunity to inform Det. Anderson of his conversation with Anders during her interview of him, he chose not to. As Plaintiff admits, withholding this information was not authorized by the City, and, contrary to his characterization of the evidence, the "initial acquisition of the information" did not appreciably further the City's interest. If anything, it compromised (to the extent it was not already compromised) Det. Anderson's investigation. Accordingly, the City is not liable for the actions of Lt. Robinett.

## IV.    Conclusion

The court finds no genuine issue of material fact exists with respect to the claims raised in Plaintiff's Second Amended Complaint. Therefore, the court must **GRANT** Lt.

Robinett's Motion for Summary Judgment (Filing No. 85) and **GRANT** Defendants'

Motion for Summary Judgment (Filing No. 87).


**SO ORDERED** this 17th day of January 2017.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.